FILED
Clerk
District Court

APR 1 1 2007

For The Northern Mariana Islands
By_____
(Deputy Clerk)

STEPHEN J. NUTTING, ESQ.
Post Office Box 5093
Saipan, MP 96950
Telephone:  (670) 234-6891
Facsimile:  (670) 234-6893

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

| | |
|---|---|
| IOTA PARTNERS, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> SMITHBRIDGE GUAM, INC., <br><br> Defendant. | CIVIL ACTION NO. CV-07-0015 <br><br> COMPLAINT |

## JURISDICTION AND VENUE

1. Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

2. IOTA Partners (hereinafter "IOTA") is a Limited Partnership organized in the State of Idaho. On information and belief Smithbridge Guam, Inc. (hereinafter "Smithbridge") is a lawful corporation organized and existing under the laws of the Territory of Guam.

3. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

-1-

4.     Because the CNMI is the venue in which all events relevant to this complaint took place, and because Smithbridge is subject to personal jurisdiction therein, venue is properly placed in the CNMI pursuant to 28 U.S.C. §1391.

## PARTIES

5.     IOTA is a Limited Partnership organized in the State of Idaho, doing business in the island of Rota, Commonwealth of the Northern Mariana Islands (CNMI).

6.     Smithbridge Guam, Inc. is a corporation incorporated in the Territory of Guam, doing business in Guam and in the CNMI. At all times relevant to this complaint, Smithbridge was doing business in the island of Rota, CNMI, in furtherance of its contract with IOTA as described herein.

## FACTS

7.     IOTA is conducting the salvage of the Spanish galleon *Santa Margarita* which sank off the coast of the island of Rota in 1601 under the terms of an agreement between IOTA and the CNMI government entitled "Santa Margarita Salvage Agreement" dated September 15, 1997 (hereinafter the "Salvage Agreement").

8.     Pursuant to the Salvage Agreement, IOTA has obtained various permits from the U.S. Army Corps of Engineers (ACOE) and the Coastal Resources Management (CRM), the Division of Environmental Quality (DEQ) and various other agencies within the CNMI which set out the terms and restrictions of IOTA's salvage operations.

9.     As a result of government restrictions and seasonal variances due to the location of the

shipwreck, IOTA is only able to conduct salvage operations for a brief period of time over the summer months each calendar year.

10. In 2005, IOTA determined that during the 2006 dive season it needed to use heavy equipment (the excavator) to remove an overburden of rocks and dead coral that now cover the salvage site.

11. In order to implement the excavator at the dive site, it was necessary to deploy the excavator across the reef flat and to position it on the edge of the reef on a daily basis.

12. IOTA's permits with the ACOE and CRM and other agencies of the CNMI government require that IOTA not cause significant damage to the coral reef near the *Santa Margarita* salvage site.

13. IOTA contacted Smithbridge, a contractor who represented to IOTA that it had extensive experience in marine excavation, to obtain an excavator, and to provide the advice and expertise needed to devise a method to move the excavator back and forth from the Rota shoreline across the reef flat to the edge of the reef at the salvage site.

14. Smithbridge represented that it could supply the excavator, operators, and supporting equipment and supplies for the excavation project. Smithbridge provided a number of suggestions as to methods of transporting the excavator across the reef and deploying and positioning the excavator on the edge of the reef flat.

15. Early on, Smithbridge suggested the use of two large wooden platforms which could be lifted and swung into position alternately for the excavator to travel across the reef flat on the platforms

and to stage the excavation operations from the edge of the reef.

16.     This method was ultimately rejected by Smithbridge in favor of the use of a number of wooden planks which would be reinforced with concrete which could be strategically placed across the reef and which would remain in place during the excavation, which would allow the excavator to travel across above the reef flat thereby eliminating or minimizing any damage to marine ecosystems.

17.     Smithbridge agreed to design, manufacture, and deploy, movable reinforced concrete and wooden planks ("the planks") for the purpose of moving the excavator across the reef flat from the shoreline to the reef edge.

18.     Smithbridge viewed the dive site and staging area on multiple occasions and had full knowledge of IOTA's requirements as it related to the excavation at the dive site and the transportation of the excavator across the reef flat.

19.     Smithbridge designed and constructed the planks with full knowledge of IOTA's requirements.

20.     Smithbridge was solely responsible for the design and construction of the planks and the selection and provision of the excavator.

21.     Based on the discussions between IOTA and Defendant, the parties entered into a contract (the Contract) on August 2, 2006.

22.     Under the terms of the Contract, Smithbridge agreed to provide the excavator, its operators

-4-

and supporting equipment, and to design, manufacture, transport and deploy the planks at the excavation site on the island of Rota.

23. IOTA agreed to pay Smithbridge weekly rental fees for the excavator and its associated costs.

24. IOTA also agreed to purchase seventy-seven (77) planks and to pay for other costs including insurance, mobilization and demobilization costs and for the shipping of the planks.

25. IOTA obtained ACOE and CRM and DEQ permit amendments for the 2006 salvage season to allow the operation of the excavator from the edge of the reef flat and the use of wooden platforms to transport the excavator across the reef flat.

26. In August 2006 Defendant brought the excavator, the supporting equipment and the planks from the island of Guam to Rota.

27. On August 22, 2006, Smithbridge began to lay the planks at the salvage site at an area designated by and under the direction of the Rota Coastal Resources Management Office ("Rota CRM") using the excavator to place and move them.

28. At no time prior to, or during, the placement of the planks did Smithbridge object to the area designated by Rota CRM, or otherwise advise that the planks would not perform as required at the site selected by Rota CRM.

29. The planks began to crumble and break apart as soon as the excavator was driven over them.

30. On August 23, 2006, CRM ordered IOTA to suspend its operations at the salvage site because the failing planks were depositing concrete rubble and other materials into the water and on

the reef flat.

31. On the same day, ACOE ordered IOTA to clean up the broken planks. From August 23rd until salvage operations were terminated in September, IOTA engaged in a continuous clean up operation to recover the remains of the broken planks.

32. IOTA was required to hold almost daily negotiations with CRM, ACOE, and the CNMI Division of Environmental Quality (DEQ) regarding the deterioration of the planks during the time excavation was to be conducted.

33. Rather than pursuing the excavation, IOTA was also forced to use the excavator and to rent other equipment and hire additional manpower to recover broken plank debris rather than to further pursue the salvage of the *Santa Margarita*.

34. The first use of the excavator as intended in the excavation of the *Santa Margarita* wreck site took place on August 24, 2006, but the excavator malfunctioned after two or three minutes of work.

35. From August 24th until removal of the excavator from the salvage site on September 18, 2006, mechanical difficulties and other staging problems associated with the failed planks limited the use of the excavator at the salvage site well below the 55 hours a week that was specified by the Contract. During the 31 days the excavator was on the island of Rota it managed to actually escavate a total of 10 hours and 15 minutes. This limited amount of excavation failed to provide any advances in the salvage operations.

36. As a result of mechanical difficulties associated with the excavator, the failure of the excavator to perform as represented by Smithbridge, and the failed planks, IOTA terminated its

efforts to further conduct salvage operations for the 2006 season on September 18, 2006.

37.  IOTA has paid Smithbridge the total sum of $170,000 for the planks, the use of the excavator and supporting equipment, and associated costs of the Contract.

38.  IOTA also paid other costs associated with the shipping, stevedoring and other expenses related to the failure of the planks and excavator which have not yet been fully determined.

39.  On October 31, 2006, CRM, DEQ, and the CNMI Division of Fish and Wildlife (DFW) issued an Administrative Order requiring IOTA to submit mitigation plans regarding damage caused by deterioration of the planks provided to IOTA by Smithbridge and threatening IOTA with the imposition of substantial fines. Proceedings on this Administrative Order are pending at this time.

40.  As a result of the failure of the excavator and the planks to perform as represented by Smithbridge, IOTA's entire dive season for the year 2006 was completely wasted, and all monies expended by IOTA in obtaining permits for the excavation, the mobilization of equipment, labor and manpower to conduct salvage operation for the 2006 dive season were wasted and lost.

41.  As a further result of the failure of the planks, IOTA has suffered substantial damage to its reputation in that it has been reported in local and internationally circulated media and on the internet that "Shipwreck Salvage Company Destroys Coral Reef Off Rota" Such false and slanderous and libelous reports were directly attributable to the failure of the planks designed, manufactured and deployed by Smithbridge.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

42. IOTA incorporates paragraphs 1 to 41 as if fully set forth herein.

43. IOTA and Smithbridge were parties to a contract and had obligated themselves under the Contract.

44. The Contract was valid and enforceable.

45. IOTA performed the Contract in each and every respect.

46. Smithbridge breached the Contract in that the excavator and the planks that Smithbridge provided were defective and unsuited to the purposes contemplated by the Contract.

47. Defendant's failure to provide a suitable excavator and planks constitutes a breach of the Contract, which breach was material because Smithbridge did not substantially perform a material obligation required under the Contract.

48. As a result of defendant's breach, IOTA has been damaged in the amount exceeding $170,000 paid directly to Smithbridge for the construction of the planks, mobilization and demobilization, and the fees and other costs related to the lease of the excavator.

49. IOTA suffered additional damages which were reasonably foreseeable as a result of Smithbridge's breach including but not limited to mobilization for the salvage operation for the year 2007, the payment of staff and other personnel to conduct the salvage operation, the costs of cleaning up the debris resulting from the failure of the planks, and other expenses which were incurred to

further the salvage efforts which were lost as a result of the failure of the excavator and planks to perform and the resulting breach of the contract.

## SECOND CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

50. IOTA incorporates paragraphs 1 to 49 as if fully set forth herein.

51. Smithbridge negligently misrepresented the quality, durability, and operating capabilities of the excavator and the planks in that, among other things, Smithbridge carelessly, negligently, falsely, and without due care to ascertain the truth and accuracy of its statements, represented to IOTA as a positive statement of known fact that the excavator could be moved safely to the salvage site over the system of planks that Smithbridge would design and construct, without damage to the reef, and that, once moved, the excavator could accomplish the salvage work for which it was provided by Defendant.

52. IOTA suffered injury and damage as an approximate result of its reliance on Defendant's negligent misrepresentations, in that IOTA was unable to conduct salvage operations during a significant portion of the 2006 salvage season. IOTA also incurred the expense of clean-up operations at the salvage site, as well as the expense of defending against the Administrative Order brought on by the CNMI regulatory authorities and possible fines and penalties yet to be determined.

53. In addition, IOTA faces future restrictions and interference from CNMI and federal agencies regarding its future salvage efforts.

54. Defendant's misrepresentations caused IOTA injury and damages in an amount which cannot be presently determined, but will be determined as of the time of trial.

# THIRD CAUSE OF ACTION

## BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

55. IOTA incorporates paragraphs 1 to 54 as if they are fully set forth herein.

56. At all times relevant to this complaint, Smithbridge was in the business of marine excavation contracting.

57. At the time of entering into the Contract with IOTA, Smithbridge had reason to know, and did know, the particular purpose for which IOTA required the excavator and the planks. IOTA relied on the skill, experience, expertise and judgment of Smithbridge to select and provide the excavator and to design, construct, provide and place the planks.

58. Pursuant to the provisions of 5 CMC §2315 of the Uniform Commercial Code (UCC), Smithbridge warranted to IOTA that the excavator and the planks would be fit for IOTA's purposes, namely to use the planks to aid in moving the excavator from the Rota shoreline to the salvage site of the *Santa Margarita*, and then to use the excavator effectively in the salvage effort.

59. The defective planks and excavator were in all respects totally unfit for IOTA's purposes.

60. Smithbridge thus breached the warranty of fitness for a particular purpose.

61. As a result of the breach of warranty, IOTA sustained serious financial loss and was required to expend substantial sums of money in order to correct the situation caused by the breach of warranty.

62. As a result of the breach of warranty, IOTA may incur the expense of CNMI government and ACOE fines and penalties as well as future governmental interference with IOTA's salvage efforts.

63. As a direct result of Defendant's breach of the warranty of fitness for a particular purpose,

IOTA has been damaged in an amount to be determined at trial, which amount includes incidental and consequential damages.

## FOURTH CAUSE OF ACTION
## DAMAGE TO BUSINESS REPUTATION

64. IOTA incorporates paragraphs 1 to 63 as if they are fully set forth herein.

65. As a direct and proximate result of Smithbridge's actions as described in this complaint, IOTA has suffered damages to its business reputation as a result of scandalous accusations or insinuations that IOTA is recklessly destroying the coral reef on the island of Rota.

66. Such accusations and insinuations will adversely affect IOTA's efforts to obtain further permits or amendments to permits, or extension of the Salvage Agreement as necessary to allow IOTA to complete the salvage of the Santa Margarita.

67. Such accusations and insinuations will adversely affect IOTA's efforts to obtain permits to conduct other salvage operations in the CNMI, or elsewhere around the world.

68. IOTA is entitled to damages in an amount of not less than $500,000.00 as compensation for injury to IOTA's business reputation.

WHEREFORE, IOTA prays for judgment against Smithbridge as follows:

    a.    For damages in the amount of $170,000 paid directly to Smithbridge pursuant to the contract;

    b.    For damages resulting from the costs of transporting the excavator and planks to the salvage site on Rota from Guam paid by IOTA to third parties in an amount to be determined at trial;

-11-

c. For damages resulting from the costs of obtaining permits for the use of the excavator and planks to conduct the excavation from the edge of the reef flat which were wasted and lost as a result of the failure of the planks and the excavator to perform as represented and warranted by Smithbridge in an amount to be determined at trial;

d. For damages resulting from the waste and loss of all mobilization costs incurred by IOTA in preparing for the 2006 excavation which were wasted and lost as a result of the failure of the planks and the excavator to perform as represented and warranted by Smithbridge in an amount to be determined at trial;

e. For damages resulting from the costs to IOTA to clean up the planks and the rubble and debris left on the reef as a result of the failure of the planks to perform as represented and warranted by Smithbridge in an amount to be determined at trial;

f. For damages resulting from the costs to IOTA to defend against the Administrative Order issued by the CNMI Regulatory Agencies and for any fines or penalties which may be levied against IOTA as a result of the failure of the planks to perform as represented and warranted by Smithbridge in an amount to be determined at trial;

g. For an amount of not less than $500,000 for damages caused to IOTA's business reputation;

h. For pre and post judgment interest; and

i. For such other and further relief as the Court deems proper.

Dated this 4th day of ~~March~~ April, 2007.

*[signature]*

STEPHEN J. NUTTING
Attorney for IOTA
CNMI Bar No. F0164

## VERIFICATION

IOTA Partners, Ltd., by and through its authorized representative, Jack Harbeston, does hereby verify that the factual allegations contained in the foregoing Complaint are true and accurate to the best of his knowledge, information and belief and this declaration was executed on this 2nd day of ~~March~~ April, 2007, at Bellevue, WA.

*[signature] Jack Harbeston*

JACK HARBESTON
Authorized Representative of IOTA Partners, Ltd.
General Partner for IOTA Partners

-13-